**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING DIVISION**

**TIMOTHY JOE PRITT,**

        **Plaintiff,**

**v.**                              **Civil Action No. 5:13CV43
                                            JUDGE STAMP**

**CAROLYN W. COLVIN,
Acting Commissioner of Social Security,**

        **Defendant.**

**REPORT AND RECOMMENDATION RECOMMENDING THAT THE DISTRICT
COURT DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [13],
GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT[15],
AND AFFIRM THE DECISION OF THE ADMINISTRATIVE LAW JUDGE**

## I.   INTRODUCTION

On March 21, 2013, Plaintiff Timothy Joe Pritt ("Plaintiff"), by counsel Michael G. Miskowiec, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Complaint, ECF No. 1.) On May 23, 2013, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the proceedings. (Answer, ECF No. 7; Administrative Record, ECF No. 8.) On July 22, 2013, and August 19, 2013, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 13; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 15.) Following review of the motions by the parties and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.   BACKGROUND

## A.    Procedural History

On August 20, 2009, Plaintiff protectively filed a Title II claim for disability insurance benefits ("DIB"), alleging disability that began on October 1, 2007 (R. at 104, 188-192).[1] Plaintiff's claim was initially denied on December 2, 2009 and again upon reconsideration on April 13, 2010. (R. at 127-31, 133-35).  On April 22, 2010, Plaintiff filed a request for a hearing (R. at 136), which was held before United States Administrative Law Judge ("ALJ") Mark Swayze on July 19, 2011. (R. at 28-74).  Plaintiff appeared and testified in person with his representative, David Meredith, Esq., before the ALJ in Morgantown, West Virginia.  (R. at 30).  James Ganoe, an impartial vocational expert, also appeared and testified.  (R. at 30, 64-71).  On August 11, 2011, the ALJ issued an unfavorable decision to Plaintiff, finding that he was not disabled within the meaning of the Social Security Act ("Act").  (R. at 9-21.)  On January 26, 2013, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. at 1-3).  Plaintiff now requests judicial review of the ALJ's decision finding him not disabled.

## B.    Personal History

Plaintiff was born on November 5, 1959, making him forty-nine (49) years old when he filed his DIB and fifty-one (51) years old at the time of his hearing before the ALJ.  (R. at  39, 188.) Plaintiff graduated from high school, and later had training as a truck driver, obtaining his commercial driver's license (R. at 42, 219, 254).   He has worked as a forklift operator, material

---

[1] On June 17, 2008, the claimant applied for disability insurance benefits and supplemental security income payments alleging an onset date of June 1, 2008.  The claims were denied at the initial level on July 28, 2008 without further appeal and there was no request to re-open that prior claim. (R. at 33-34).

handler, warehouse lead, lot attendant, material handler, laborer, and truck driver.   (R. at 45-22, 225, 250).   Plaintiff is married and has no dependent children.  (R. at 39).

C.    *Relevant Medical History*

**1.    Relevant Medical History Pre-Dating Alleged Onset Date of October 1, 2007**

The administrative record indicates that Plaintiff received treatment on September 29, 2002 from Patient First-BelAir in Bel Air, Maryland for lower back pain.  (R. at 391-392).  The diagnosis was musculoskeletal pain and osteoarthritis of the spine.  (R.  at 391) Plaintiff was given a work excuse and pain medication and went home.  (*Id.*).

On March 3, 2003, Plaintiff reported to Stonewall Jackson Memorial Hospital in Weston, West Virginia for chest pain.  (R. at 353-63).  Dr. Lively noted that Plaintiff had a family history of heart disease, diabetes mellitus and cancer.  (R. at 362).  In addition, Plaintiff smoked a pack and half of cigarettes a day.  (*Id.*).  Dr. Lively diagnosed Plaintiff with coronary artery disease with myocardial ischemia and transferred him to West Virginia University Hospital for a catheterization. (R. at 365).

On March 7, 2003, at West Virginia University Hospital in Morgantown, West Virginia, Plaintiff had a cardiac catheterization procedure, consisting of left heart catheterization, temporary pacemaker placement, angioplasty and stent due to the mid right coronary artery. (R. at 348-52). Plaintiff was forty-three (43) years old at the time. (*Id.*)  Dr. Sabbagh notes that the procedure was successful and recommended the standard post procedural care and for Plaintiff to stop smoking. (R. at 352, 349).

From March 12, 2003 through February 5, 2007, Plaintiff had follow up visits with Dr. Sabbagh.  (R. at 422-451).   Plaintiff saw Dr. Sabbagh two times in 2003 following surgery, three

times in 2004, two times in 2005, three times in 2006 and one time in 2007. Patient's weight was between 200 and 220 pounds during this time. (*Id*). On March 24, 2003, a stress echocardiogram report was negative. (R. at 446). Most visits thereafter appeared to be normal follow up and mostly concerned regulation of medications. (R. at 422-451).

On April 1, 2005, Plaintiff was experiencing some abdominal, back and knee pain and reported to Stonewall Jackson Memorial Hospital. (R. at 413). After several more visits, Dr. Watson determined on April 11, 2005, that Plaintiff may have Prostatitis and was given a course of antibiotics. (R. at 407). Upon reviewing the x-rays on April 11, 2005, Dr. Watson noted that the x-rays of the knees and lumbar spine series appeared to be within normal limits and that he did not see any bone spurs. (R. at 407). Plaintiff reported back to Dr. Watson on April 18, 2005, feeling better but still complaining of back and knee pain. (*Id.*). Dr. Watson reviewed the x-rays again noting that Plaintiff did have some mild osteophytes and degenerative joint disease in the lumbar region but that his knee x-rays were again within the normal limits. (R. at 406). On April 23, 2005, a diagnostic imaging was taken and Dr. Espinoza noted that there were no acute cardiopulmonary changes and the bowel gas pattern was normal. (R. at 400.).

Plaintiff started treatment with Tri-County Health Clinic ("Clinic") in March of 2007. (R. 471). In his initial visit and subsequent follow-up visits in July and September of 2007, his complaints were for ear and sinus problems, lab work, prescription refills, and regular check up. (R. at 471-78). During those visits, he had no chest pain, no shortness of breath, no joint pain, and no muscle pain. (R. 471-78).

**2.      Relevant Medical History Post-Dating Alleged Onset Date of October 1, 2007**

On December 11, 2007, Plaintiff reported for his three month recheck with the Clinic.  (R. at 479).  At that appointment, the medical records indicated that Plaintiff's main complaint was of foot spasms occurring in cold weather.  (*Id.*).  Further there were notations that Plaintiff was recently laid off work and  was just sitting around the house. (*Id.*).    He was advised to stop smoking and exercise for thirty (30) minutes per day.  (R. at 480).

When Plaintiff returned to the Clinic on March 4, 2008, he had not quit smoking, had not been exercising and had gained weight.  (R. at 481).   The appointment was for a three-month recheck on hyperlipidemia and Plaintiff reported no chest pain, no joint pain, and no muscle pain. (*Id.*).  Plaintiff was continued on his medication,  encouraged to quit smoking and lose fifteen pounds, and told to follow up in one month or sooner, if needed. (R. at 484-85).  Plaintiff reported back on April 5, 2008, for sore throat and cold related symptoms.  (R. at 486).  On  May 22, 2008, Plaintiff reported for his three month recheck on his hyperlipidemia and reflux.  (R. at 488). Plaintiff complained of pain radiating to his right arm.  (*Id.*).  The progress notes reflect that Plaintiff was still smoking, still out of work and had some weight loss.   A myocardial perfusion imaging study was taken on May 29, 2008, which was unremarkable.  (R. at 504).

On July 25, 2008, Dr. Fulvio Franyutti completed a physical Residual Functional Capacity ("RFC") assessment of Plaintiff.  (R. at 461-68).  Dr.  Franyutti notes that Plaintiff's limitations in daily living are not to the degree alleged by Plaintiff.  (R. at 466).  The doctor further states that Plaintiff is considered only  partially credible. (*Id.*).

 On September 19, 2009, Plaintiff returned Tri-County Health Clinic for his three-month

check up.  (R. at 490).  There was nothing remarkable in the examination.  (R. at 490).  Plaintiff's medication was updated and he was asked to return in three months.  (*Id.*).  On March 27, 2009, Plaintiff reported back for  his regular follow up stating he was "feeling ok;" that he did not have sufficient chest angina to take a nitro.  (R. at 491-92).  Notations in the medical record indicate that Plaintiff continues to smoke.  (*Id.*).  At Plaintiff's July 2, 2009 follow up appointment, Plaintiff reported that although he still gets Angina that it is unchanged and stabled.  (R. at 493).  Further Plaintiff complained at this appointment that his arthritis is worse and that his knees and hips are aggravated by walking and standing.  (*Id.*)

On February 22, 2010, Plaintiff reported to Tri-County Health Clinic for recheck and to get medication refills.  (R. at 514).  The doctor's notes indicated that Plaintiff reports chest pain 2-3 times per week but has not had to use nitro.  In addition, the Plaintiff complained that his left knee hurts and the medication is not helping with the pain.  (*Id.*).

On March 12, 2010, Wilda Posey, M.A. completed a mental status profile of the Plaintiff for the West Virginia Disability Determination Service.  (R. at 525-530).  The evaluation provides that Plaintiff was within normal limits for all activities except recent memory where the evaluator noted that Plaintiff was severely deficient.  (R. at 528).

On March 18, 2010, Dr. Sabio completed a history and physical examination of Plaintiff for the West Virginia Disability Determination Service. (R. at 517-24).   Plaintiff's chief complaints were cardiovascular disease, arthritis, degenerative disk disease, hearing loss, shortness of breath, and depression. (R. at 517).   Dr. Sabio notes the following regarding Defendant's general appearance: "The patient is well-developed, moderately obese.  He is alert and oriented to time, place and person.  He walks with a normal gait.  He does not require any ambulatory aids and he is

stable at station...." (R. at 518).

A physical RFC assessment was completed on April 2, 2010 by Rogelio Lim, M.D. (R. at 531-38). Dr. Lim comments in the assessment that:

> Allegations not fully credible. No current ischemia. PFT mild restrictive lung impairment. Hearing loss but able to communicate well. HPN but no EOD. Arthralgia but normal gait. MRI 2003 but no current ischemia to require cardiac intervention. HX of cardiac stress negative. Full ROM of all joints and spine.

(R. at 538).

On April 8, 2010, Joseph A. Shaver, Ph.D. completed a Psychiatric Review Technique of Plaintiff. (R. at 539-552). His conclusions were "[o]verall, only mild impairment seems to exist in the areas of daily activities, social functioning and concentration. It is believed that Clmt possesses the mental capacity to engage in gainful work-like activity on a sustained basis." (R. at 552).

On May 18, 2010, Dr. Aimee Whitehair performed a Physical Capacities Evaluation. (R. at 553-57). Dr. Whitehair noted that Plaintiff suffers from fatigue for which there is a reasonable basis, angina. (R. at 554). Further she noted that there is a reasonable basis for Plaintiff's pain, osteoarthritis and chest pain. (R. at 555). Dr. Whitehair also noted that Plaintiff's pain is disabling to the extent that it would prevent the patient from working full time at even a sedentary position. (R. at 555). She also placed Plaintiff at a Class IV American Heart Association Functional Capacity stating that her opinion is based on Plaintiff's subjective history, which is that he **gets chest pain at rest and unable to walk 100 feet without shortness of breath and chest pain**. (Emphasis added, R. at 557). [2]

---

[2] The ALJ found that Plaintiff's subjective complaints to Dr. Whitehair were not supported by the medical record and therefore, gave Dr. Whitehair's opinion less weight. (R. at 19).

On June 2, 2010, Dr. Vohra with the WVU Cardiology Clinic in Elkins examined Plaintiff at request of Dr. Whitehair. (R. at 558-61). Due to a high pretest probability of coronary artery disease and in-stent restenosis, Dr. Vohra scheduled Plaintiff for a cardiac catheterization on June 15, 2010. (R. at 560). The cardiac catheterization was performed on June 15, 2010 at WVU Hospitals. (R. at 562-645). On the date of the procedure, Plaintiff presented "...with a history of chest heaviness associated with some exertion and occasionally at rest. He has some radiation to his left arm. He denies any nausea, vomiting or diaphoresis. The patients coronary risk factors include hypertension, dyslipidemia, tobacco use and family history." (R. at 565). Dr. Khamare and Dr. Vohra noted that Plaintiff had "...[M]oderate to severe stenosis in the left system. Totally occluded right coronary artery. Mild to moderately reduced left ventricular systolic function." (R. at 566). Their recommendation was to refer Plaintiff for a percutaneous intervention to his right coronary artery. (*Id.*). Following this diagnostic, Dr. Moreland and Dr. Jain performed an "unsuccessful attempt at percutaneous transluminal coronary angioplasty to a chronic total occlusion in the mid right coronary artery." (R. at 568). The doctors recommended normal post procedure care, aggressive risk factor modification, medical therapy maximized and further attempts at percutaneoud coronary intervention if that is determined to be a viable option. (R. at 569).

On July 12, 2010 and August 5, 2010, Plaintiff reported to Dr. Whitehair with complaints about his ears. (R. at 697-702).

Plaintiff had a follow up with Dr. Vohra, a cardiologist, on August 18, 2010. (R. at 646). "From a cardiac standpoint, the patient states he is doing well. He states that since being on Plavix, his chest pain has decreased in both frequency and intensity; but he still has the occasional episode of dull chest pain." (R. at 647). Due to Plaintiff's improved symptoms, the plan was to proceed

with aggressive risk factor modification, such as lowering cholesterol and quitting smoking. (R. at 647-48). Plaintiff was to return for a follow up after his PET scan. (R. at 648). Plaintiff obtained the PET scan on August 30, 2010. (R. at 657-58). The radiology report by Daniel Martin indicated as follows: "1. No evidence of stress induced ischemia or scar from prior infarc. 2. Slightly dilated appearing left ventricle, with a low LVEF of 44 percent." (R. at 657, 660).

On October 5, 2010, Plaintiff followed up with Dr. Whitehair who noted that Plantiff's coronary artery disease was stable. (R. at 703-705). Dr. Whitehair further noted that Plaintiff's chest pain had improved in both frequency and intensity and Plaintiff was continuing follow up with his cardiologist. (R. at 703, 705). Dr. Whitehair also saw Plaintiff on January 4, 2011, January 18, 2011, February 15, 2011 and March 8, 2011 to follow up on an ear infection and refill prescriptions. (R. at 706-17). At a recheck for ear infection on August 5, 2010, there is a notation in the medical record as follows: "Obesity, unspecified (Added on May 17, 2010) discess [sic] recommendations for screening c-scope 5/17/10-pt declines.... Obesity, unspecified (Added on October 5, 2010)." (R. at 700).

In May 2011, Plaintiff reported to Dr. Oliverio and Dr. Haslip for follow up on chronic ear issues. (R. at 719). He was advised that he is a candidate for a tympanomastoidectomy but that given his current cardiac issues, he would continue to be treated medically. (*Id.*).

## D. Testimonial Evidence

At the hearing before the ALJ, Plaintiff testified that he was fifty-one (51) years old; that he was 5'10' tall and 238 pounds. (R. at 39). Plaintiff further testified that his normal weight was 190. (*Id.*). Plaintiff is married, lives with his wife and has no children. (*Id.*). Plaintiff stated that he graduated from high school in 1979 and other than what he completed to obtain his commercial

driver's license in 2004 that he had no other vocational or job training. (R. at 42-43). Plaintiff no longer has a valid commercial driver's license because he could not pass the Department of Transportation ("DOT") physical. (R. at 42). Plaintiff testified that he has worked as a truck driver, material handler, forklift operator, and lot attendant (R. 47-49). Plaintiff was in the Coastguard for a couple of weeks in 1980 but left because of anxiety over his pregnant wife. (R. at 43). Plaintiff's wife works as a cook. (R. at 44). Plaintiff receives $193 per month in food stamps. (R. at 44).

When the ALJ inquired if Plaintiff used tobacco products, Plaintiff testified that he was trying to quit smoking but that currently he smoked half a pack a day. (*Id.*). He further testified that he had been smoking for thirty (30) years; that for the past six (6) months he had been smoking half a pack per day but for the past fifteen (15) years he had smoked two (2) packs per day. (R. at 42).


Plaintiff stated that he lived in a one story home with no basement, that he had a valid driving license with eyeglasses as a restriction and that he drove approximately once per week to and from the doctor's office and pharmacy. (R. at 40). Plaintiff further testified that he rode in a car to the hearing; that it was an hour and a half drive and that he stopped four times along the way for five minute breaks to stretch and move around. (R. at 41).

The ALJ inquired as to whether there have been any changes in Plaintiff's conditions since the filing of his function report in February of 2010. (R. at 53). Plaintiff testified that the only changes were that he was "probably more depressed" and that his stamina level has decreased. (R. at 54). Plaintiff testified that now he could not walk as far as he reported in 2010; that he can only stand five minutes before he has to sit; that he can sit for only twenty (20) minutes before he has to stand; and that he can only lift a gallon of milk or eight (8) pounds. (R. at 54). Plaintiff testified that

his depression affects his concentration (R. at 55.). He further testified that the side effects of his medications cause nausea, lightheadedness, dizziness, digestive problems, irritable bowel, tiredness and "that kind of thing." (R. at 56).

When the ALJ inquired about Plaintiff's symptoms since his catheterization in June 2010, Plaintiff testified that his symptoms of shortness of breath and chest pain have increased and gotten more frequent and more severe. (R. at 56). When the ALJ asked Plaintiff what he felt his most disabling condition was, Plaintiff said "constant fatigue." (R. at 59). When asked about his chest pain, Plaintiff testified that he has chest pain daily but only uses nitrogen when he feels severe pain, which occurs four to five times a week. (R. at 59-60).

With regard to Plaintiff's ear problems, Plaintiff testified that for the past four years he has been battling ear infections. (R. at 61). There has been discussion with his doctor about an operation but he is currently managing the problem by periodically taking antibiotics. (R. at 61). Plaintiff testified that he has 40 to 50% loss of hearing in his right ear and a more sever loss of hearing in his left ear. (R. at 62). Mr. Meredith, Plaintiff's representative , stated that the hearing loss was probably "transient" and that he did not think it would be an ongoing issue. (R. at 63).

### E.    *Vocational Evidence*

Also testifying at the hearing before the ALJ was James Ganoe, an impartial vocational expert. At request of the ALJ, Mr. Ganoe characterized Plaintiff's past relevant work. (R. at 65). Most of his past employment were medium exertional level and unskilled. (R. at 65-66).

The ALJ then posed the following hypotheticals to Mr. Ganoe:

Q:    All right. I want you to assume a hypothetical individual of the same age, education, and work experience as the claimant who retains the capacity to perform light work with the following limitations: no more than occasional balancing, stooping, kneeling, crouching, crawling, climbing of ramps and

stairs; no climbing of ladders, ropes, or scaffolds; the work should accommodate a sit/stand option that allows the person to alternate sitting or standing positions throughout the workday without breaking task; the work should avoid concentrated exposure to extreme hot and cold temperatures, vibration, irritants such as fumes, odors, dust, gases and poorly ventilated areas and hazards including dangerous machinery and unprotected heights; and the work should involve exposure to no greater than a moderate noise intensity level. Can such an individual perform the past work of the claimant as it was actually performed or as it is customarily performed per the DOT?

A:      No, I don't believe he'd be able to, Your Honor. I believe most of the jobs that were under the light exertional level, none of those would allow for a sit/stand option, Your Honor.

Q:      ...Are there other jobs in the regional or national economy that such an individual could perform?

A:      Under the light exertional level, Your Honor, a male clerk working in private business; 202,000 nationally; 2,300 regionally. And to accommodate for the sit/stand option, Your Honor, I'd reduce those number in half. The DOT code is 209.687-026; and the SVP is 2, Your Honor.
        Also a price marker; 319,000 nationally; 1.675 regionally; again, Your Honor,
        I'd reduce those numbers in half to accommodate for the sit/stand option; the DOT code is 209.587-034; and the SVP is 2, Your Honor.
        Those are samplings, Your Honor.

Q:      Using the same hypothetical individual with all of the previous limitations who is further limited to routine, repetitive tasks in a low-stress environment defined as having only occasional decision making required and only occasional changes in the work setting and only occasional interaction with the public, coworkers, and supervisor.
        Would those additional limitations impact either of the jobs you indicated in response to the previous hypothetical?

A:      No, it would not, Your Honor.

(R. at 67-68.)

Then the ALJ had Mr. Ganoe review Exhibit 16F, the physical capacity evaluation of Dr. Whitehair. (R. at 68). Mr. Ganoe opined that a person with the limitations described in Exhibit 16F would not be able to perform Plaintiff's past type of work or any jobs in the regional or national

economy. (R. at 69). Mr. Meredith, Plaintiff's representative, had no questions for Mr. Ganoe. (R. at 71).

A Report of Contact form dated July 25, 2008, noted that Plaintiff could perform his past work as "Warehouse Forklift operator (10/2002-4/2003) described by claimant as sedentary work with no lifting or carrying (he loaded and unloaded trucks)." (R. at 247). A Report of Contact form dated December 2, 2009 noted that Plaintiff could perform his past work as a lot attendant as he described it. (R. at 300). A Report of Contact form dated April 12, 2010, gave job details of his past employment and remarked that:

> Claimant can not return to any of his past work due to his exertional level and restrictions of OCC: climbing, balancing stooping, kneeling, crouching, crawling, never with ladder/rope/scaffolds and avoid concentrated exposure to cold, heat, vibration, fumes, oders, dusts, gases, poor ventilation and hazard machinery. Did not list the lot attendant as only worked 2 months. Claimant can perform one of the above jobs with the restrictions and exertional level.

(R. at 328-329). The "above" jobs listed on the report of contact were Lost and Found Clerk; Horse Identifier and Bouncer. (R. at 329).

### F.    *Lifestyle Evidence*

In an Adult Function Report dated June 25, 2008, Plaintiff reported that he spends his day watching television, eating and taking short walks in the home. (R. at 237). Plaintiff notes that his condition does not affect his ability to care for himself. (R. at 238). He can prepare sandwiches and frozen dinners. (R. at 239). He can dust and do dishes. (*Id.*). Plaintiff can not do yard work because he has too much pain in his back and legs. (R. at 240). He does not need reminders to take his medicine. (R. at 239).

Further Plaintiff reported that he is able to drive and go outside by himself. (R. at 240.) He

does not do any shopping, but he is able to pay bills and handle a checking and savings account. (*Id.*)

Plaintiff's hobbies and interests include listening to music, watching television, and using a computer. (R. at 241). He reported that he does spend time with others sitting and talking every once in a while but he does not travel far to see friends or family. (*Id.*)

In another Adult Function report dated November 4, 2009, Plaintiff reported that while working on chores and doing his normal daily activities, he takes frequent breaks due to weakness, fatigue, dizziness, lightheadedness, shortness of breath, angina pains, pain in back, hips, and knees, occasional radiating pain into his legs, occasional numbness in his upper legs, swelling and cramping in his hands and swelling in his feet. (R. at 287-88). He also reported that he experiences sadness, frustration, poor concentration, difficulty focusing and memory loss. (*Id*).

Plaintiff reported that due to his conditions, he "at times" lacks the motivation to change his clothes and that putting on clothes is difficult. (R. 288-299). Further, he uses the shower walls for support when showering and the bathroom counter for support when going to the bathroom. (R. at 289). His wife does the heavy chores and yard work due to his conditions. (R. at 290). He drives but his wife does the grocery shopping because of his conditions. (R. at 292). Plaintiff prepares simple meals daily such as cereal, soup, sandwiches, vegetables and baked meats. (*Id.*). His wife handles all the finances. However, Plaintiff noted in the report that he can pay bills, count change, and use a checkbook and money orders, if he needed to do so. (*Id.*) He reported that he can go to his doctor's appointments alone although he prefers to have someone with him because of his conditions. (R. at 293). He is only able to walk fifty (50) yards before he has to stop and rest for about five (5) minutes. (R. at 295).

In another Adult Function report dated December 2, 2010, Plaintiff reported basically the same types of limitations in his previous report. (R. 312-319). He continues to experience weakness, fatigue, dizziness, lightheadedness, shortness of breath, angina pains about once a week, pain in his back, hips, and knees, occasional radiating pain into his legs, occasional numbness in his upper legs, swelling and cramping in his hands, swelling in his feet, feelings of sadness and frustration, poor concentration, difficulty focusing and memory loss. (R at 313). These conditions cause him to lack the motivation to care for his personal hygiene, but only at times. (R. at 313). Plaintiff further reports that he usually leaves the house once a week to go to doctors appointments and run simple errands like going to the bank or pharmacy. (R. at 316). This report is very similar to the Function Report dated November 4, 2009.

### III.    CONTENTIONS OF THE PARTIES

Plaintiff, in his motion for summary judgment, asserts that he is entitled to summary judgment "on the grounds that there is no genuine issue as to any material fact and that he is entitled to a judgment as a matter of law." (Pl.'s Mot., ECF No. 13) Specifically, Plaintiff asserts that he is entitled to summary judgment because:

•    The ALJ erred by failing to properly evaluate Mr. Pritt's obesity and its effect, in combination with his other impairments, on his ability to work.

•    The ALJ's finding concerning Mr. Pritt's mental residual functional capacity is not sufficiently detailed to ensure that the vocational expert understood Mr. Pritt's limitations.

(Pl's Br. in Supp. Mot. for Summ. J. ("Pl.'s Br.") at 1, ECF No. 14). Plaintiff asks the Court to reverse or remand the ALJ's decision. (*Id.* at 1.)

Defendant, in his motion for summary judgment, asserts that the ALJ's decision "is

supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot., ECF

No. 15). Specifically, Defendant alleges that:

- The ALJ adequately considered Plaintiff's obesity and

- Substantial evidence supports the ALJ's finding that Plaintiff could perform routine,

    repetitive work in a low-stress environment, with only occasional decision making and only

    occasional changes in the work setting.

(Def.'s Br. Supp. Mot. for Summ. J. ("Def.'s Br.") at 3, ECF No. 16.)


## IV.    STANDARD OF REVIEW

The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") applies the

following standards in reviewing the decision of an ALJ in a Social Security disability case:

> Judicial review of a final decision regarding disability benefits . . . is limited to
> determining whether the findings . . . are supported by substantial evidence and
> whether the correct law was applied. *See* 42 U.S.C. § 405(g) ( "The findings . . . as
> to any fact, if supported by substantial evidence, shall be conclusive . . . ."));
> *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); *Coffman v.
> Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). The phrase "supported by substantial
> evidence" means "such relevant evidence as a reasonable person might accept as
> adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. at 401, 91 S. Ct.
> at 1427 (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206,
> 216 (1938)) . . . . If there is evidence to justify a refusal to direct a verdict were the
> case before a jury, then there is "substantial evidence." *Laws v. Celebrezze*, 368 F.2d
> 640, 642 (4th Cir. 1966). Thus, it is not within the province of a reviewing court to
> determine the weight of the evidence, nor is it the court's function to substitute its
> judgment . . . if the decision is supported by substantial evidence. *See Laws v.
> Celebrezze*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 529 (4th Cir. 1962).

*Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit has defined substantial

evidence as "evidence which a reasoning mind would accept as sufficient to support a particular

conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a

preponderance." *Laws,* 368 F.2d at 642.

Because review is limited to whether there is substantial evidence to support the ALJ's conclusion, "[t]his Court does not find facts or try the case *de novo* when reviewing disability determinations." *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Furthermore, **"the language of § 205(g) . . . requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"** *Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (emphasis added).

## V.   ANALYSIS

### A.   *Standard for Disability and the Five-Step Evaluation Process*

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . . . "[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

*See* 42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

> (I) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets

the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . . ." 20 C.F.R. §§ 404.1520, 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920 (2011). If the claimant is determined to be disabled or not disabled at any of the five steps, the process does not proceed to the next step. *Id.*

## B. *Discussion of the Administrative Law Judge's Decision*

Utilizing the five-step sequential evaluation process outlined above, the ALJ made the following findings:

1. **The claimant meets the insured status requirements of the Social Security Act through March 31, 2013.**

2. **The claimant has not engaged in substantial gainful activity since October 1, 2007, the alleged onset date (20 CFR 404.1571, *et seq.*).**

3. **The claimant has the following severe impairments: coronary artery disease; hypertension; hyperlipidemia; degenerative joint disease; mild restrictive pulmonary disease; history of bilateral hearing loss (20 CFR 404.1520(c)).**

4. **The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).**

5. **After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light**

work as defined in 20 CFR 404.1567(b) with a sit/stand option allowing the person to alternate sitting or standing positions throughout the workday without going off-task; performing all posturals occasionally (balancing, stooping, kneeling, crouching, crawling and climbing of ramps/stairs), except no climbing of ladders, ropes or scaffolds; avoiding concentrated exposure to extreme hot and cold temperatures, vibrations, irritants (such as fumes, odors, dust, gases and poorly ventilated areas) and hazards (including dangerous machinery and unprotected heights); exposure to no greater than moderate noise intensity level; must be limited to routine, repetitive work in a low stress environment described as having only occasional decision-making involved and only occasional changes in work setting.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on November 5, 1959 and was 47 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.4569).

11. The claimant ha\]s not been under a disability, as defined in the Social Security Act, from October 1, 2007, through the date of this decision (20 CFR 404.1520(g)).

(R. at 11-20).

C. *Analysis of the Administrative Law Judge's Decision*

1. The ALJ did not act contrary to the law by not considering Plaintiff's alleged

> **"obesity" and there was substantial evidence to support the ALJ findings with regard to Plaintiff's work limitations because neither the treating physician nor consultative examiners attributed any added degree of limitation due to Plaintiff's alleged "obesity."**

As his first assignment of error, Plaintiff asserts that the ALJ failed to consider Plaintiff's obesity and it's effect, in combination with his other impairments, on his ability to work. (Pl.'s Br. at 1.) Specifically, Plaintiff allege that the ALJ "completely failed to consider that Mr. Pritt suffered from obesity." (*Id.* at 8). The ALJ does not mention "obesity" at all in his decision. (R. at 9-21). The ALJ's only reference to Plaintiff's weight is as follows: "At follow up in December 2007, the claimant was advised to stop smoking and to lose weight by exercising 30 minutes every day and increasing his intake of vegetables." (R. at 13).

Obesity, while no longer a listed impairment, is a medically determinable impairment that can meet or equal a listing impairment when combined with an impairment of the musculoskeletal, respiratory, or cardiovascular body system. SSR 02-1p, 2000 WL 628049 at *1 (Sept. 12, 2002).

Plaintiff alleges that the ALJ's failure to mention obesity in his decision was a failure to comply with Social Security Ruling 02-1p. (Pl.'s Br. at 9). Plaintiff asserts that since both Dr. Whitehair, Plaintiff's treating physician, and Dr. Sabio, Plaintiff's consultative physician, "diagnosed" Mr. Pritt with obesity, binding social security policy requires that obesity be considered as one of Mr. Pritt's medically determinable impairments. (*Id.*).

It is not clear from the record whether "obesity" was actually "diagnosed" by either Dr. Sabio or Dr. Whitehair. (R. at 517-24, 692-718). Dr. Sabio referred to the Plaintiff being "moderately obese" in the general appearance section of his report and makes no other reference to "obesity" or weight thereafter. (R. at 518). Dr. Sabio reports under the headings "Physical

Examination: General Appearance:" as follows:

> The patient is well-developed, moderately obese. He is alert and oriented to time, place and person. He walks with a normal gait. He does not require any ambulatory aids and he is stable at station. He is able to hear and understand conversational voices spoken at normal volume levels. The visual fields are normal by gross confrontation testing.

(R. at 518). Dr. Sabio did not attribute any added degree of limitations to Plaintiff's conditions because of the alleged diagnosis of "obesity."

In Dr. Whitehair's "Problem List Summary" on page 693 of the record, the following are listed as active problems: "obesity, unspecified" (added to May 17, 2010); "obesity, unspecified" (added to October 5, 2010) and "overweight" (added on January 18, 2011). (R. at 693). Throughout the rest of Dr. Whitehair's records these issues are listed under "Past Medical History: Active Problems:" (R. at 694, 697, 700, 703, 706 709, 712, 715). "Obesity" and/or "overweight" are not mentioned in the "Chief Complaints" nor in "Assessment/Plan" sections of Dr. Whitehair's record. (R. 692-718). Dr. Whitehair's records do not include any information on Body Mass Index ("BMI") or other observations about Plaintiff's build other than weight and height. (*Id.*). Dr. Whitehair did not attribute any added degree of limitations to Plaintiff's conditions because of the alleged diagnosis of "obesity."[3]

In addition, the ALJ noted in his opinion that he gave less weight to Dr. Whitehair's opinions and that for various reasons her opinions were not entitled to controlling weight under 20CFR 404.1527. (R. at 19).

---

[3] The ALJ noted in his opinion that he gave less weight to Dr. Whitehair's opinion because it was based on the Plaintiff's condition prior to his catheterization in June 2010 and the Plaintiff's subjective complaints, which were only partially credible. (R. at 19). Therefore Dr. Whitehair's opinions were not entitled to controlling weight under 20 CFR 404.1527. (*Id.*).

Where there is no diagnosis of "obesity" but clinical notes or other medical records consistently showing high body weight, SSR 02-1P provides that the ALJ may use his own judgment to establish the presence of obesity. SSR 02-1p *4. 2002 WL 34686281 (September 12, 2002).

Social Security Ruling 02-01p explains the administration's policy and protocol on the evaluation of obesity. "Obesity is a complex, chronic disease characterized by excessive accumulation of body fat." SSR 02-1p, 2002 WL 34686281 (September 12, 2002). The ruling recognizes Body Mass Index (BMI) as one of the indicia of an individual's degree of obesity. *Id.* Social Security Ruling 02-1 provides that at step two of the five step evaluation, obesity may be considered alone or in combination with another medically determinable impairment. At Step Three of the evaluation process, the administrator may find that obesity, either by itself or in combination with other impairments, meets a listed impairment if the obesity is equivalent in severity: "[f]or example, if the obesity is of such a level that it results in an inability to ambulate effectively, as defined in sections 1.00B2b or 101.00B2b of the listings, it may substitute for [the criteria of 1.02A] and we will then make a finding of medical equivalence." *Id.* at *5.

Upon review of the medical evidence, only two doctors in the entire administrative record referred to the Plaintiff as "obese" and neither of those doctors noted any added limitations his obesity may have on his ability to work or his other impairments. (R. at 517-24, 692-718). In addition, "obesity" was never mentioned at the hearing before the ALJ on July 19, 2011 in Morgantown, West Virginia. (R. at 28- 74). The ALJ asked both the Plaintiff and his representative at the hearing to identify the various conditions that Plaintiff alleges make him unable to work. (R. at 36-37, 52). Neither Plaintiff nor his representative even mentioned Plaintiff's weight or "obesity" at the hearing. (R. at 28-74). The ALJ's decision regarding Plaintiff's work limitation is supported

by substantial evidence because the ALJ thoroughly reviewed all the impairments and conditions presented to him at the hearing, which included an in depth review of all the symptoms and conditions alleged in Plaintiff's three Adult Function Reports filed in June 2008, November 2009 and February 2010 and their effect on his ability to work. (R. at 13, 14).

The undersigned finds in this case that the ALJ's failure to explicitly consider the effects of a Plaintiff's obesity is harmless error. *See Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006); *see also Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) ("[A]ny remand for explicit consideration of [claimant's] obesity would not affect the outcome of this case."); *cf. Ngarurih v. Ashcroft*, 371 F.3d 182, 190 n.8 (4th Cir. 2004). Furthermore, when appealing the ALJ's decision, the claimant must specify how his obesity (1) limits his functioning and (2) exacerbates his or her impairments. *Moss v. Astrue*, No. 2:11-cv-44, 2012 WL 1435665, at *6 (N.D. W. Va. Apr. 25, 2012) (citing *Cook v. Astrue*, 800 F. Supp. 2d 897, 907-08 (N.D. Ill. 2011)). In the present case, Plaintiff has not specified how his obesity limits his functioning and exacerbates his impairments. *See Moss*, 2012 WL 1435665, at *6.

Accordingly, the undersigned finds that the ALJ's failure to mention "obesity" is harmless error, where "obesity" was never mentioned as at the ALJ hearing and the ALJ thoroughly considered all of Plaintiff's work limitation in his review of the record and Plaintiff's Adult Functioning Report. "The court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008); *see also Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir. 2003) ("The doctrine of harmless error . . . is fully applicable to judicial review of administrative decisions"); *Hurtado v. Astrue*, 2010 WL 3258272,

at *11 (D.S.C. July 26, 2010) ("The court acknowledges there may be situations in which an error in an opinion is harmless because it would not change the outcome of the ALJ's decision"); *cf. Ngarurih v. Ashcroft*, 371 F.3d 182, 190 n. 8 (4th Cir. 2004) ("While the general rule is that an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained, reversal is not required where the alleged error clearly had no bearing on the procedure used or the substance of the decision reached.").

In sum, the ALJ did consider the effect of Plaintiff's exacerbated symptoms caused by his weight and other conditions on his ability to perform work as they were listed in his Adult Function Reports and throughout the medical record. Because the ALJ considered the actual symptoms of "obesity" that were in the medical record and Adult Function Reports, the failure to actually label Plaintiff as obese in his decision was harmless error. Therefore, substantial evidence supports the ALJ's determination regarding the effects of Plaintiff's impairments on his ability to work.

### 2. Substantial evidence supports the ALJ's finding that Plaintiff could perform routine, repetitive work in a low-stress environment, with only occasional decision making and only occasional changes in the work setting.

As Plaintiff's second assignment of error, Plaintiff alleges that the ALJ's finding concerning his mental residual functional capacity is not sufficiently detailed to ensure that the vocational expert understood his limitations. (Pl.'s Br. at 1.) The undersigned finds this argument to be without merit.

A claimant's Residual Functional Capacity ("RFC") is the most that a claimant can still do despite his limitations. 20 C.F.R. § 404.1545(a)(1). A claimant's RFC evaluates his ability to meet the physical, mental, sensory, and other requirements of work. 20 C.F.R. § 404.1545(a)(4). The

evaluation of a claimant's mental RFC is an assessment of his ability to perform certain mental

activities, such as limitations in understanding, remembering, or carrying out instructions; or

responding appropriately to supervision, co-workers, and work pressures in a work setting. 20

C.F.R. § 404.1545(c). The claimant's mental RFC is determined by evaluating evidence such as:

- History, findings, and observations from medical sources (including psychological test results), regarding the presence, frequency, and intensity of hallucinations, delusions or paranoid tendencies; depression or elation; confusion or disorientation; conversion symptoms or phobias; psycho physiological symptoms; withdrawn or bizarre behavior; anxiety or tension.

- Reports of the individual's activities of daily living and work activity, as well as testimony of third parties about the individual's performance and behavior.

- Reports from workshops, group homes, or similar assistive entities.

SSR 85-16, 1985 WL 56855, at *2 (1985).

> The ALJ clearly states in his opinion that:

> On evaluation in March 2010, Ms. Posey noted that the claimant had severely deficient recent memory, but the evidence of record indicates that the claimant has had no more than "mild" limitations in activities of daily living, social functioning, and concentration, persistence and pace. The evidence of record documents no episodes of decompensation. There is no indication in the evidence of record that any treating physician referred the claimant to any psychological, psychiatric or mental health care facility and the claimant found no reason to seek any mental health care treatment on his own.

(R. at 12, 525-30). The ALJ further details Ms. Posey's psychological evaluation as follows:

> Ms. Posey found the claimant's recent memory to be "severely deficient, but his immediate and remote memory were "within normal limits." Ms. Posey stated that the claimants concentration measured by serial sevens was "within normal limits." Likewise, Ms. Posey found the claimant's persistence and pace were "within normal limits"(Exhibit 13F).

(R. at 15, 525-30). Additionally, the ALJ posed the following hypothetical to the vocational expert:

> Q. Using the same hypothetical individual with all of the previous limitations who

is further limited to routine, repetitive tasks in a low-stress environment defined as having only occasional decision making required and only occasional changes in the work setting an only occasional interaction with the public, coworkers and supervisor.

Would those additional limitation impact either of the jobs you indicated in response to the previous hypothetical?

A.  No. It would not., Your Honor.

(R. at 68).

Given that Plaintiff's mental limitations were only mild and not even moderate, the ALJ more than adequately captured them in the RFC and hypothetical question. *See, e.g.*, *Mills v. Astrue*, No. 11-65, 2012 WL 2030093, at *22 (N.D. W.Va. April 9, 2012) (finding that the hypothetical question with limitations to simple, unskilled work adequately captured moderate limitation in concentration, persistence, and pace, where substantial evidence demonstrated that Plaintiff could engage in simple, unskilled work).  Accordingly the undersigned finds, that there is substantial evidence in the record to support the ALJ's finding that Plaintiff experienced only mild limitations in concentration, persistence, and pace, and could perform routine, repetitive work in low-stress environment, i.e., work activity consisting of only occasional decision making and occasional changes in the work setting. (R. at 17).

## VI.   RECOMMENDATION

For the reasons herein stated, the undersigned finds that the Commissioner's decision denying the Plaintiff's applications for disability insurance benefits is supported by substantial evidence. Accordingly, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment (ECF No. 13) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 15) be **GRANTED**, and the decision of the Commissioner be affirmed and this case be **DISMISSED**

**WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn,* 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all parties who appear *pro se* and all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this **2nd day of January 2014**.

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE